The opinion of the Court was delivered by
Nott, J.
That usage does, in many instances, constitute the law,[1] and that contracts must be construed with reference to the usage of trade or business, to which they relate, are principles too well established to be questioned now. Numerous examples are to be found among the cases arising on policies of insurance; and perhaps no stronger case can be found than that of three days’ grace allowed in cases of bills of exchange. But to entitle a usage to that high respect, it must be a reasonable one. It must be for the benefit of trade generally, and not for the convenience and benefit of a particular class of individuals. And I can conceive of no usage that will authorize a departure from positive instructions. The instructions of a principal to his agent, make the law by which he is to be governed. And to authorize him to depart from them, would be depriving the parties of the privilege of making their own terms. I can see no benefit resulting to the community from such usage. It is calculated rather to destroy that confidence which is necessary for the encouragement of trade. No planter would dare to trust *his property in the hands of a factor upon such terms. That such courtesy has *314 been, indulged until now, and that it would be thought uncivil to refuse it, I have no doubt; and I have as little doubt that any factor attempting a different method of doing business, would suffer by it. But let it once become general, and no inconvenience would result. Let it be understood, that a factor is to give indulgence at his own risk, and that he is not to sacrifice the interest of the planter to the feelings of the merchant, and the evil will correct itself. I do not mean to say that no confidence is to be placed in a man of good credit, or that property may not, in any instance, be delivered to the purchaser until the money is paid. On the contrary, all the confidence which is necessary in the usual course of business, I think ought to be allowed. I should have thought that if the factors had received a check on a bank for the money when they delivered the rice, that they would have acted within the scope of their authority, even though it had been dishonored Such conduct in a purchaser would have been a species of swindling, against which it could not have been expected that the seller would have been guarded.
The whole doctrine, indeed, may be expressed in a few words. If a factor reposes a confidence which amounts to giving credit to a purchaser, when he has been directed to sell for cash, he does it at his own risk, and must be answerable for the consequences. But as this was not the ground on which the jury bottomed their verdict, perhaps it is not an important point in the case. I will therefore proceed to inquire, whether the defendants ought to have been made liable on the score of negligence. It must be admitted, that, after they were put on their guard, all possible vigilance ought to have been used. Yet we do not find a single effort made on their part to recover the money. And we are not to presume anything of which there is no proof. It is difficult, perhaps, to point out what would have been the result of any course which they might have Copied. But these are ^speculations in which they ought not to have indulged. They ought at least to have made some exertion, and neglecting to do so, amounted to a tacit acknowledgment on their part, that they were willing to run the risk. If we are to be allowed to indulge in conjecture, I have no doubt but that in the then situation of the purchaser, any effort would have been attended with success. I am, therefore, satisfied with the verdict on that ground.
s With regard to the exception taken to the opinion of the Court, it is sufficient to observe, it is admitted, that the law was correctly stated to the jury ; and the mere speculative opinion of a judge by way of illustrating any position, or in answer to the arguments of counsel, can never be a good ground for a new trial. The whole amount of the opinion was, that where a person, to protect himself from the effects of a fraud attempted to be practised upon him, does an act legally wrong, yet morally right, and where the other party had sustained no real injury, in all probability, would only give nominal damages. But it was distinctly stated, on the other hand, that where no such excuse could be set up, they would, as probably, give damages proportionate to the injury or the nature of the trespass. It is not presumed that there was any thing improper in those observations, or that they were in any manner calculated to mislead the jury.
The motion, therefore, must be refused.
Bay, Colcock, Johnson and Gantt, JJ., concurred.
*315 Cheves J.
The verdict of the jury in this ease is in the following words:
“ We find for the plaintiff, the sum of twelve hundred and six dollars and fifty-three cents ; each party paying his own cost of suit, and ground this verdict on the unanimous opinion, that due diligence was not used by the defendants to recover the property, or its amount.” The defence was, that the defendants had sold the property to a person in good credit. That *when instructions to sell for cash were given, and the sale made accordingly, the usage of trade authorized the delivery of the property before payment, and that a short time, from a week to a fortnight, might be allowed to the purchaser to make the payment, with a right, nevertheless, to demand immediate payment at any moment. The evidence proved the usage, according to my judgment, most conclusively ; but it is material to state, that in this case the forbearance, in no point of view, exceeded three days, and I think it fair to consider it as not exceeding one; for on the day after the delivery, there is reason to believe, though it was not made the subject of express proof, because one of the defendants (Tunis,) was the only person who could have proved the fact, that the demand was made, I mean at the time when Mr. Crawford communicated to him his suspicions.
The question, therefore, in this case is, in fact, whether the usage authorized the delivery of the property before the payment of the money. But I will consider the question on the usage proved, and suppose that these defendants had forborne for the period which it authorized.
The terms of the verdict are very material. The jury state the ground of their verdict to be want of exertion on the part of the defendants in retaking the property, or, in the alternative, in bringing suit against the purchaser. It negatives all other grounds of recovery by the plaintiff, and distinctly recognizes the grounds of the defence. 1st, the usage; and 2d, the good credit of the person to whom he sold. The proof on the last point, was such as made a question which it might have been said was peculiarly for the jury. On the first, the proof was so full, uniform and conclusive, as to leave no question.
The verdict, however, leaves none on either point, and therefore it remains only to consider,
1. Whether the Court will regard the terms of this verdict.
2. Are they such as can charge legally the defendants.
3. ^Whether the usage, as proved, is such as the Court ought to sustain.
1. The terms of the verdict ought to govern the Court on the subject. When a jury gives a general verdict, it is not competent to the Court to conjecture what the grounds of the verdict were, or to receive their subsequent declarations on the subject. But it ought to be otherwise when they put the grounds of their verdict on the record. In the ease of Middleton v. Heyward,[1] Charleston, May, 1819, this Court unanimously granted a new trial, because the verdict of the jury stated grounds, which in the opinion of the Court, could not sustain it.
2. Are then, the grounds assigned by the jury in this case, such as ought to sustain their verdict?[2] They are not. The first is, that the *316 defendants should have retaken the property after it was delivered. This would have been a trespass, and an act of violence, and I. will never consent, as an administrator of the laws, to make' a man liable to heavy penalties, because his zeal in the cause of his; employer was not so great as to make him violate the law. . Their next ground is, that he should have instituted a suit, and I suppose it is to be understood, held the purchaser to bail.' I doubt the obligation of the defendants to have done this under any circumstances, unless indeed it was á part of the usage in such cases;; But admit it to have been their duty-in any case in which the propriety of it was probable. Was the propriety of it probable in this case ? The credit of the purchaser was doubted by Mr. Deliesseline, and those (and those only I think), who obtained their - information directly or indirectly from him; and all that he, states, was, that a man of acknowledged punctuality, previously, had failed to pay a note, which he held, when due ; but that by gentle means, he had subsequently been able to obtain goods for the greater part of it. Mr. Crawford added to this his suspicions founded altogether on the agitation that the man manifested. Now, in considering this point, the propriety *of confiding in Powers, in the first instance, is to be laid out of the question. The only question is, whether the circumstances indicated and furnished reasonable proof, that he was about immediately to abscond ; for otherwise it would have been useless to hold him to bail; and certainly there was nothing in the evidence which authorized any such conclusion. There was much in it to render it the most improbable event that could be conceived. To say that he ought to have been held to bail was to deny all the chances of getting payment, which Mr. Deliesseline and others had to the moment of his departure used with success, and to provoke and irritate him, without the hope of any advantage, in such a manner as was likely to make him prefer every other creditor who had not treated him with the same severity. If, then, the grounds stated by the jury, as the foundation of their verdict, did not authorize it, we have to inquire:
3. Whether the usage, as proved, is such as the Court ought to sustain. This is an important question, and the only one on which I desired to say a word in this case. It involves not only the case before us, but will have a tendency, in the rejection of the usage, to unsettle and keep in agitation those tacit contracts in the affairs of trade, which are, on the one hand, the result of a species of necessity, and on the other, the greatest security of the ignorant and unwary: for it will be found, I have no doubt, ultimately, that the protection which we are about to extend will be a burden, which those on whom it is cast will be obliged to throw off by voluntary contract. It will be found to be one of those acts of too much regulation which enlightened policy has cast off, both in politics and commerce. Let the parties alone to manage their own affairs in their own way.
It is argued, that this usage is unreasonable, and therefore not a good usage. I know, we frequently say, that a usage to be binding must be reasonable. But I very much doubt whether this is not a mistaken view of the subject, and drawn from a supposed, but not real, analogy between commercial usages and common* law customs. I doubt whether there can be a commercial usage which can be deemed so palpably *317 unreasonable as not to be binding. A usage so unreasonable can never grow up. The free course of trade will not permit it; as well might a plant vegetate under a great incumbent weight. That it is a usage is itself a proof of its reasonableness, so irrefragable, that no abstract reasoning can explain it away. The real question ought to be, Is it a usage ? Has it been sufficiently established ? To establish a usage it ought to be so general, uniform.and frequent, as to warrant an inference, that the party, against whom the benefit of it is claimed, had a knowledge of it, and contracted with reference to it Such was the proof in this case. Men who had been in business forty years found it established when they commenced. They declare it to be beneficial, not to themselves but the planter. That it is necessary to the management of the sales of the agricultural products of the country. But it may be imagined that they are interested witnesses. How is the fact ? They are factors. The property put into their hands will sell advantageously, without a resort to this usage, or it will not. If it will, their trouble is diminished, and their gains are equal. If it will not, it is hardly necessary to say, that the disadvantage will be more felt by the planter. - It will be in the proportion of 2 1-2 percent., the factor’s commission, to 9 1-2, the nett proceeds of the property. Indeed, this numerical proportion does not state the case strongly enough. The property must be sold, and the factor must get his commissions. Embarrassments in business may diminish his reward, and protract the- receipt of it, but they will have the same effects on the principal. But to the planter’s loss is to be supcradded storage, insurance, or equivalent risk, and other peculiar charges. The witnesses who proved the usage were then, at least, disinterested, and were those who best understood it, and best knew its value. But its value does not rest merely on the opinion of witnesses. A little knowlege of the circumstances* of the country, and the course of commerce will point out its origin and utility. Our agriculture furnishes a greater surplus than any known to the world, compared with our population. It is all thrown into the channels of commerce. If they were closed, it would have no value; without them we should be poor indeed. Every commercial embarrassment diminishes, and every facility increases, the value of our products. The great engine of their convertibility from worthlessness to riches is capital. But while we are great agricultural producers, we have very little commercial capital domesticated. It comes to us from abroad. But it is in the nature of commercial capital, not to be conveyed in the shape of bags of money from one country to another. This is the clumsy operation of primitive times, and of States doomed not to be commercial. It is too late for us to consider whether we ought to be commercial or not. We are irretrievably so. I think happily so. In the employment of commercial capital, credit and confidence are essential. Every facility increases its power. It is a bad employment of capital to keep it inactive for a day, and hence, even a day’s forbearance forms one of those innumerable facilities, small, some of them, in themselves, but in the mass important and nhcessary, which gives to capital its greatest power, and reduces its price to the lowest rate. We want every facility of this kind. The cotton and rice of a single crop (which are the production exclusively of the Southern States, where there is so little domesticated *318 capital,) amounts to little less than thirty millions of dollars, and this to be advantageously sold, is to be purchased and paid for principally by the capital of other States and countries, in the short averaged period of six months. Instead of being disposed to declare on the abstract speculations of the closet, as we must do, the usages which affect this great operation to be unreasonable and void, they raise in my mind nothing but unmixed admiration. The particular usage under consideration has subsisted for a longer period than forty years, and the *present is almost the only plaintiff that has come into Court. Drive the parties to special contracts, and their contests will be innumerable.
K. L. Simons, for the motion. Hayne Attorney-General, contra.
The usuage appears to me to be reasonable and beneficial, independent of the opinions of the respectable witnesses who have give to it the sanction of their judgment and experience, which in itself, would satisfy my mind had I any doubt on the abstract consideration of it. I think a new trial ought to be granted.

 Ante, 116.

 Heyward v. Middleton, 1 Mills, 186.

 2 Sp. 685.